Filed 1/29/14  P. v. Maldonado CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MOISES MALDONADO,<br><br>    Defendant and Appellant. | B243699<br><br>(Los Angeles County<br>Super. Ct. No. KA095727) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert M. Martinez, Judge.  Affirmed in part, reversed in part and remanded.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Moises Maldonado appeals from his conviction, following a jury trial, of forcible rape, attempted forcible rape, kidnapping, felony false imprisonment and assault with a deadly weapon involving two victims. He contends that as to the charges involving one of the victims: (1) the kidnapping conviction was not supported by substantial evidence; and (2) the false imprisonment conviction must be reversed because it is a lesser included offense of kidnapping. In addition, defendant contends, and the People agree, that the matter must be remanded to the trial court for imposition of certain mandatory fines. We affirm the kidnapping conviction, reverse the false imprisonment conviction and remand for the trial court to impose the requisite fines.

## PROCEDURAL BACKGROUND

Defendant was charged by amended information with kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1))[1]; count 1); forcible rape (§ 261, subd. (a)(2); count 2); attempted forcible rape (§§ 664, 261, subd. (a)(2); count 3); false imprisonment by violence (§ 236; count 4); and assault with a deadly weapon (§ 245, subd. (a)(1); count 5); enhancements for personal use of a deadly weapon were alleged as to counts 2, 3 and 4. A jury found defendant guilty of kidnapping (a lesser included offense of kidnapping to commit rape), forcible rape, attempted forcible rape, false imprisonment by violence and assault with a deadly weapon. It also found true the weapon enhancements on counts 2, 3 and 4.

Defendant was sentenced to 29 year to life in prison comprised of a 25-years-to-life term on count 2 (forcible rape); plus a consecutive 3-year midterm on count 3 (attempted forcible rape), plus a consecutive one year for the personal weapon use alleged on count 3; sentences were imposed on counts 1 (kidnapping), 4 (false imprisonment) and 5 (assault with a deadly weapon) but were stayed pursuant to section 654. Defendant timely appealed.

---

[1] All undesignated statutory references are to the Penal Code.

## FACTS

### A. The People's Case

#### 1. *Count 3 (Attempted Rape of Melissa D.)*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358 (*Zamudio*)), the evidence established that late at night on July 30, 2011, Melissa D. was walking home alone from the Dynasty Club located on Holt Avenue in Pomona. A black Mustang circled the block a few times before it pulled over and the driver (later identified as defendant) offered Melissa a ride. Melissa accepted. Once in the car, Melissa named the major cross streets near where she lived. After driving a short distance, defendant pulled over and asked Melissa if she was a prostitute. Melissa said that she was not and defendant started driving again. When Melissa told him he was driving in the wrong direction, defendant pulled over and parked in a secluded spot. Defendant suddenly pulled out a knife, put it to Melissa's throat and said in Spanish that he was going to rape her and threatened to hurt her if she screamed. Afraid for her life, Melissa complied with defendant's command that she get into the back seat. When defendant put down the knife and began to undo his pants, Melissa jumped out of defendant's car and ran to a parked truck, leaving her bag in defendant's car. Defendant drove away. The man in the truck drove Melissa back to the Dynasty Club, where she told the security guard, her friend Gary Mendoza, what had happened. Mendoza arranged for someone to take Melissa home. Melissa did not call the police that night because she was afraid.

Mendoza testified that Melissa seemed frantic when she approached him at about 11:00 p.m., on July 30, and told him she had almost been raped at knifepoint. Mendoza wanted to call the police immediately; Melissa refused but promised to call them later.

Melissa did not report the incident to police. A week later, Melissa was at a gas station when she saw her friend talking to defendant. Melissa yelled at her friend that defendant was the man who had hurt her the week before. While Melissa confronted defendant about the bag she had left in his car, the gas station attendant called the police.

3

2. *Count 1 (Kidnapping to Commit Rape of Connie D.), Count 2 (Forcible Rape), Count 4 (False Imprisonment), Count 5 (Assault With a Deadly Weapon)*

On September 18, 2011, Connie D. took a bus from Los Angeles to Pomona for a reconciliation meeting with her estranged husband. Arriving at the Pomona transit center in the predawn hours, Connie walked to Holt Avenue where she met her husband. Within minutes, their discussion devolved into a physical altercation which ended when they sprayed each other with mace. Crying and afraid to walk back to the bus station alone in the dark, Connie walked to a well-lit gas station on the corner of Holt and Garey. She was still crying when defendant pulled up in a black Mustang. In response to defendant's inquiry, Connie said she was not a prostitute. Connie told defendant about the fight with her husband and begged him to drive her back to the bus station. Defendant agreed and Connie got into his car. But instead of driving her to the bus station, defendant drove to a carport where he parked and told Connie to get into the back seat and pull her pants down. When she hesitated, he took out a knife and said, "If you don't want to find out who I am, do what I'm saying." Afraid, Connie complied. Defendant followed her into the back seat. When he put his hand on her throat, she passed out, but revived when defendant loosened his grip. She did not know how much time had passed, but when she woke up her pants were off and defendant was inside her. Connie yelled for help. When defendant noticed a man standing nearby, he started pulling up his pants. While defendant was distracted, Connie opened the car door and started to get out. But when she saw the knife she picked it up and said, "Son of a bitch, you're going to pay for this, mother fucker." Defendant blocked Connie's effort to stab him in the stomach. After defendant regained possession of the knife, Connie ran away. Defendant drove away in the opposite direction. Connie wrote down his license plate number and found her way to a nearby fire station, where someone called the police for her.

3.   *Defendant's Post-arrest Statement*

Connie and Melissa identified defendant as their assailant from a photographic lineup shown to them by Detective Mario Valencia. Valencia and another officer, Sergeant Gutierrez, interviewed defendant after he was arrested on October 3, 2011. A recording of the interview, which was conducted in Spanish, was played for the jury and an English language translation was introduced into evidence. Defendant initially claimed not to remember the July 30 incident with Melissa, but later admitted picking up a woman on Holt, asking her how much she charged, telling her he did not have that much and using a knife to force her to have sex with him; the woman escaped before they had sex. Defendant gave multiple versions of his encounter with Connie on September 18. Eventually, defendant admitted picking up a woman at a gas station on Holt and Garey. After the woman got into defendant's car, she offered to have sex with him for $100. Defendant said "Okay," and then followed the woman's directions as to where to park. During intercourse in the back seat of defendant's car, the woman demanded her money. When defendant said he did not have any money, the woman got mad and refused to continue. Defendant pulled out a knife he kept in the compartment between the seats, grabbed the woman by the neck and told her, "You're going to keep going until we're finished." The woman grabbed the knife and cut defendant's hand. When defendant grabbed the knife back, the woman ran away. On the way to the hospital to have his cut treated, defendant threw the knife away.

**B.    The Defense Case**

Contrary to what defendant told Detective Valencia, at trial defendant testified that he did not know Melissa and had nothing to do with the July 30 incident she described. Defendant recalled meeting Connie on September 18, but described a different version of that encounter than the one he recounted in his recorded post-arrest interview. Defendant recalled that Connie approached him while he was at a gas station where he stopped for gas on his way to work. She asked him for a ride, in exchange for which she promised to

5

pay for his gas.  Defendant agreed, but did not put any gas in his car.  Following Connie's instructions, defendant drove to a location and parked.  After some small talk, Connie asked defendant if he wanted to have sex.  Defendant was surprised because he did not think she was a prostitute.  Initially, defendant refused, but then changed his mind.  They were in the back seat of defendant's car in the midst of intercourse when Connie asked defendant how much he was going to give her.  She got mad when defendant said he only had $20.  Connie climbed back into the front passenger seat and was looking through her purse while defendant climbed into the driver's seat.  As defendant was turning on the ignition, Connie took a knife out of her purse and told defendant he could not leave until he paid her.  Connie cut defendant's hand before he managed to get the knife away from her.  After Connie ran away, defendant threw the knife away because it had blood on it.  Defendant did not report the incident to police.  He lied in his post-arrest interview because he was under the influence and the officers told him he would get a better deal if he admitted raping both women.

## DISCUSSION

A.      *Substantial Evidence Supports the Kidnapping Conviction*

Defendant contends there was insufficient evidence of force or fear to support his conviction for kidnapping Connie D.  He argues that she voluntarily entered his car.  Defendant is incorrect.

The standard of review for the sufficiency of the evidence is well settled.  We review the whole record, in the light most favorable to the judgment, to determine whether there is evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary

6

conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.] [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*Zamudio, supra,* 43 Cal.4th at pp. 357-358.)

"Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).) Known as "simple kidnapping," violation of section 207, subdivision (a) requires force or fear and cannot be accomplished by means of fraud. (*People v. Green* (1980) 27 Cal.3d 1, 64 [evidence that defendant lured victim into car under false pretenses insufficient to support kidnapping conviction], overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 234-238 and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.)

The existence of a kidnapping is not negated by the fact that the victim initially accompanies the perpetrator voluntarily if the perpetrator " ' "*subsequently restrains his victim's liberty by force* and compels the victim to accompany him further." ' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017 (*Hovarter*).) The force used to restrain the victim need not be physical; giving orders which the victim feels compelled to obey out of a reasonable fear that the accused will harm the victim if he or she does not obey constitutes force. (*People v. Galvan* (1986) 187 Cal.App.3d 1205, 1213 (*Galvan*).)

In *People v. Camden* (1976) 16 Cal.3d 808, 812 (*Camden*), the court found substantial evidence of force or fear to support a kidnapping conviction where, although the victim initially got into the defendant's car voluntarily, he "used force to restrain the victim in the car while asportation continued over both a substantial distance and a substantial period of time. When [the victim] first attempted to leave the vehicle defendant pulled her back. Later she was prevented from leaving the automobile because of the high rate of speed at which the car was being driven. Defendant frustrated the victim's second escape attempt by the application of centrifugal force which developed

7

from a sudden right turn. Finally, she jumped out of the moving car in order to gain her freedom and in doing so incurred painful injuries." (See also *People v. Alcala* (1984) 36 Cal.3d 604, 622, (*Alcala*), overruled on other grounds in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.)

Relying on *Camden*, the court in *Galvan, supra,* 187 Cal.App.3d at page 1205, affirmed a kidnapping conviction where the evidence established the victim voluntarily got into a car with the defendant and several other men believing that they would drive her home from a party. When they drove in the opposite direction, the victim objected. During the ensuing 45-minute drive, the victim asked to be taken home multiple times, but the driver refused. The victim was afraid to jump out of the car. The court held, "When, as here, the victim could not have extricated herself from a moving vehicle and was transported miles away from her home, asportation is sufficient to constitute kidnapping." (*Id*. at pp. 1214-1215.) More recently, in *Hovarter, supra,* 44 Cal.4th at page 1017, our Supreme Court held that even if the murder and kidnapping victim accepted a ride voluntarily, the defendant's subsequent decision to "maintain his control of her in his truck vitiated any initial voluntariness, converting the encounter into one in which she was being transported against her will, that is, a kidnapping." (*Ibid.*)

Here, Connie testified that she got into defendant's car voluntarily because he promised to drive her to the bus station, which was about a block away. When defendant drove in the opposite direction, Connie asked several times where they were going and demanded that he stop the car. Defendant responded, "Be calm. Don't worry about it. Just be calm." While defendant was driving, Connie looked for the car door handle "to open the door if I had to jump out . . . ." Connie testified that while defendant was driving, "I didn't feel threatened but I didn't feel good because we were not going in the right direction and I didn't know where we were going. So I didn't know what to expect, and I just was trying to find the door handle just in case because things happened."

This evidence was sufficient to support the asportation element of kidnapping. Under *Camden, Alcala*, *Galvan* and *Hovarter*, the jury could reasonably conclude that defendant's decision to maintain control of Connie in his moving car vitiated any initial

8

voluntariness and converted the encounter into a kidnapping. To the extent Connie testified that she was not threatened, the jury could reasonably have found this either to have been false bravado or a statement that she did not feel any attack was imminent.

B.      *The Conviction for False Imprisonment Must Be Reversed*

Defendant was convicted of both kidnapping (count 1) and false imprisonment (count 4) as to Connie. For the false imprisonment charge, the court imposed but stayed sentence pursuant to section 654. Defendant contends the false imprisonment conviction must be reversed, not sentence merely stayed, because false imprisonment is a lesser included offense within kidnapping. We agree the court should have stricken the false imprisonment conviction rather than stay it pursuant to section 654. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)

The elements of kidnapping are: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. (§ 207, subd. (a); *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1368.) " '[T]he forcible detention of a victim is an element of kidnapping and as long as the detention continues, the crime continues.' [Citation.]" (*People v. Thomas* (1994) 26 Cal.App.4th 1328, 1334 (*Thomas*).) False imprisonment is "the unlawful violation of the personal liberty of another." (§ 236.) Because a kidnapping cannot be committed without unlawful violation of the personal liberty of another (i.e., detention), false imprisonment is a lesser included offense of kidnapping, and a defendant cannot be convicted of both based on the same act. (*People v. Chacon* (1995) 37 Cal.App.4th 52, 65; *People v. Magana* (1991) 230 Cal.App.3d 1117, 1120-1121.)

Here, defendant's single act of forcibly detaining Connie was the basis of defendant's convictions for both kidnapping as charged in count 1 and false imprisonment as charged in count 4. Therefore, the conviction of the lesser included offense of false imprisonment must be reversed.

9

We are not persuaded otherwise by the People's argument that the proscription against multiple convictions for both a greater and lesser included offense does not apply in this case because the kidnapping and false imprisonment were based on different acts. According to the People, the kidnapping was based on the act of forcibly detaining Connie in a moving vehicle whereas the false imprisonment was based on the act of forcibly detaining her with a knife. The flaw in the People's argument is that it presupposes there were two separate detentions, which is contrary to the rule that a kidnapping continues as long as the forcible detention continues. (*Thomas, supra,* 26 Cal.App.4th at p. 1334.) In *Thomas, supra,* for example, the defendant abducted the victim in a mall, drove her to one location where he stopped and raped her and then drove her to a second location for the purpose of robbing her. Holding that the defendant could not be convicted of two kidnappings, the court explained that, although the defendant's plans for obtaining money from the victim "may have changed in approach during the course of the kidnapping, the initial kidnapping did not end with the commission of the sexual offenses, and there was only one continuous kidnapping." (*Ibid.*)

Here, under the reasoning of *Thomas*, the kidnapping did not end when defendant parked in the carport and a new false imprisonment did not begin when defendant forced Connie into the back seat at knifepoint; defendant simply changed the means by which he was forcibly detaining Connie from a moving vehicle to a knife.

The cases upon which the People rely for a contrary result are inapposite. In *People v. Milward* (2011) 52 Cal.4th 580, 589, the court concluded that the inmate defendant, who stabbed another prisoner, could not be convicted of both assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)) and aggravated assault by a life prisoner (§ 4500), because the former is a lesser included of the latter. (*Milward*, at pp. 588-589.) In *People v. Cortez* (1981) 115 Cal.App.3d 395, 410, the defendant and three codefendants were convicted of oral copulation while confined in state prison (§ 288a, subd. (e)), committing oral copulation while acting in concert with another person (§ 288a, subd. (d)) and forcible oral copulation (§ 288a, subd. (c)). The appellate court rejected the defendant's contention that violation of section 288a, subdivision (c)

10

(forcible oral copulation) was a lesser included offense within section 288a, subdivision (d) (forcible oral copulation while acting in concert) because the two counts resulted from two separate acts of forced oral copulation comprising two distinct offenses.

The third case upon which the People rely, *People v. Ortega* (1998) 19 Cal.4th 686, 699, overruled on another point in *People v. Reed* (2006) 38 Cal.4th 1224, supports our conclusion that the false imprisonment conviction must be reversed. In *Ortega*, the four defendants stopped a van occupied by two people, beat both of the occupants and took personal property from both; two of the defendants drove away in the van followed by the other two defendants in a car. All four defendants were convicted of two counts of carjacking, two counts of robbery and grand theft based on the taking of the van. Our Supreme Court reversed the grand theft conviction, reasoning that the robbery and grand theft convictions were based in part on the same act: taking of the van. (*Id*. at pp. 699-700.) Here, the kidnapping and false imprisonment were based on the same act: forcibly detaining Connie. For this reason, the false imprisonment conviction must be reversed.

C.      *Remand for Correction of the Abstract of Judgment*

Defendant contends, and the People concede, that the abstract of judgment does not correctly reflect the fines, fees and restitution ordered by the trial court. We agree.

Section 290.3, subdivision (a) requires that a defendant convicted of a qualifying sex offense be fined $300. That fine is subject to additional penalties pursuant to section 1464, subdivision (a) and Government Code section 76000, subdivision (a). (*People v. Stewart* (2004) 117 Cal.App.4th 907, 910.) A trial court's failure to impose those additional fines is jurisdictional error. (*Id*. at p. 911.)

Here, the trial court imposed, among other fines, a sexual habitual offender fine of $300 (§ 290.3).[2] Although the trial court did not mention section 1464, subdivision (a) or

_____

[2]      The trial court also imposed a restitution fine in the amount of $240 (Pen. Code, § 1202.4, subd. (b)), a parole revocation fine in the amount of $240 (Pen. Code, § 1202.45), a court security fine in the amount of $150 ($30 on each of five counts; Pen.

Government Code section 76000, subdivision (a), the abstract of judgment includes a penalty assessment of $840 and a twenty percent "state surcharge" of $60 pursuant to section 290.3. It is unclear whether these amounts were intended to satisfy the mandatory requirements of section 1464, subdivision (a) and Government Code section 76000. Accordingly, we remand to the trial court to separately list, with the statutory basis, all fines and fees. (*People v. High* (2004) 119 Cal.App.4th 1192, 1201.)

## DISPOSITION

The conviction for false imprisonment (count 4) is reversed and the matter is remanded to the superior court to separately list, with the statutory basis, all fines and fees. In all other respects, the judgment is affirmed. The trial court is directed to forward a certified copy of the new abstract of judgment, reflecting the changes ordered by this court, to the Department of Corrections.



                                        RUBIN, ACTING P. J.

WE CONCUR:



        FLIER, J.



        GRIMES, J.

---

Code, § 1465.8), conviction assessment fee of $150 ($30 on each of five counts; Gov. Code, § 70373) and victim restitution.